**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JYOTI MARWAHA,
8972 Birch Bay Circle
Lorton, VA 22079

Plaintiff,

v.

EDISON ELECTRIC INSTITUTE
701 Pennsylvania Avenue, NW
Washington, DC 20004

*Serve*: CORPORATION SERVICE COMPANY
1156 15TH STREET NW,
Suite 605,
Washington, DC, 20005

HOLLY GREAVES
701 Pennsylvania Avenue, NW
Washington, DC 20004

Defendants.

CIVIL ACTION NO.:

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Jyoti Marwaha (hereinafter "Plaintiff" or "Mrs. Marwaha"), brings this Complaint against Defendants, Edison Electric Institute (hereinafter "EEI") and Holly Greaves (hereinafter "Ms. Greaves") (collectively, "Defendants") for violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (hereinafter "ADA"), and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq.* (hereinafter "DCHRA").

## NATURE OF ACTION

Mrs. Marwaha began her employment with EEI in July 2024. In the span of sixteen (16) months, she rose from Senior Manager to Senior Director of Human Resources, earned several

"Exceeds Expectations" performance reviews, received repeated salary increases, a performance-based discretionary bonus, executive praise, and ultimately functioned as EEI's de facto head of Human Resources.

Mrs. Marwaha has a diagnosed cardiac condition that is aggravated by stress. She disclosed that condition to Ms. Greaves and requested, as a reasonable accommodation, the hiring of an HR Lead to relieve understaffing in her department. Defendants agreed to the accommodation in writing but stalled and never provided it. Mrs. Marwaha then suffered a documented cardiac episode and Defendants declined to re-engage in the interactive process. On November 6, 2025, one day before her scheduled cardiac follow-up appointment and within weeks of her implementing anti-discrimination measures recommended by EEI's outside counsel, Defendants terminated her employment. Mrs. Marwaha had never been placed on a performance improvement plan (hereinafter "PIP") or formally disciplined. She brings this action to recover damages for the economic, reputational, and emotional harm that Defendants have caused.

## **PARTIES**

1. Plaintiff is a resident of the Commonwealth of Virginia. At all relevant times she was employed by EEI in the District of Columbia.

2. Plaintiff has a diagnosed cardiac condition, Left Ventricular Bundle Branch Block (hereinafter "LBBB"), which is a disability within the meaning of the ADA.

3. Defendant, EEI, is a corporation headquartered in and with its principal place of business in the District of Columbia, located at 701 Pennsylvania Avenue, N.W., Washington, D.C. 20004. At all relevant times EEI was an "employer" within the meaning of the ADA and the DCHRA.

4. Defendant, Ms. Greaves, is EEI's Chief Administrative Officer and was Mrs. Marwaha's supervisor. Ms. Greaves personally directed and participated in the discriminatory and retaliatory acts alleged herein. Ms. Greaves is named as a defendant on Mrs. Marwaha's District of Columbia claims, but she is not named on the ADA claims.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

6. This Court has supplemental jurisdiction over Plaintiff's District of Columbia claims, pursuant to 28 U.S.C. § 1367, because those claims arise out of the same nucleus of operative fact as the federal claims properly before this Court.

7. This Court has personal jurisdiction over Defendants because EEI maintains its headquarters and principal place of business in the District of Columbia, Ms. Greaves works in the District of Columbia, and the acts and omissions giving rise to this action occurred in the District of Columbia.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as incorporated into the ADA by 42 U.S.C. § 12117(a), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this judicial district, and Defendants conduct business within this judicial district.

9. This action arises from the same conduct at issue in a related action that is now pending in the Superior Court of the District of Columbia. Mrs. Marwaha, through former counsel, filed that action on December 31, 2025, captioned *Marwaha v. Edison Electric Institute, et al.*, No. 2025-CAB-008551, before the Honorable Katherine E. Oler (hereinafter

the "Superior Court Action"), asserting claims under the DCHRA for disability discrimination and retaliation and common-law claims for breach of implied contract and defamation. Through a series of motions for leave filed by former counsel, a First Amended Complaint was accepted by the Superior Court as the operative pleading on May 15, 2026. Mrs. Marwaha's ADA claims were not and could not have been asserted, because they had not yet been administratively exhausted.

10. On April 17, 2026, Plaintiff, by and through undersigned counsel, filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") asserting Mrs. Marwaha's ADA claims, and on May 19, 2026, filed a Notice advising the Superior Court of the EEOC Charge and of Mrs. Marwaha's intention to pursue her ADA claims, together with her related claims, in this Court upon issuance of a Notice of Right to Sue.

11. To permit exhaustion of her ADA claims, Mrs. Marwaha moved to stay the Superior Court Action pending the EEOC's issuance of a Notice of Right to Sue. By Order dated July 22, 2026, the Superior Court granted the request to stay the proceedings through October 14, 2026, to allow exhaustion; declined to permit the then-unexhausted ADA claims as not yet ripe; and continued the Initial Scheduling Conference to October 23, 2026. The Superior Court further recognized that Mrs. Marwaha's ADA claims "arise from the same underlying facts as her DCHRA claims."

12. The EEOC has now issued Mrs. Marwaha a Notice of Right to Sue, and her ADA claims are exhausted and ripe. Because those federal claims invoke this Court's original jurisdiction and her District of Columbia claims arise from the same operative facts, this Court may adjudicate the controversy. The pendency of the parallel Superior Court Action, which has

no scheduling order entered, does not bar this Court's exercise of jurisdiction. Adjudicating Mrs. Marwaha's claims together in this single federal forum will promote judicial economy and afford complete relief.

## ADMINISTRATIVE PREREQUISITES AND EXHAUSTION

13. On April 17, 2026, Mrs. Marwaha timely filed a Charge of Discrimination against Defendants with the EEOC, alleging disability discrimination, failure to provide reasonable accommodation, failure to engage in the interactive process, and retaliation in violation of Title I and Title V of the ADA.[1]

14. On July 30, 2026, the EEOC issued Mrs. Marwaha a Notice of Right to Sue. This Complaint is filed within ninety (90) days of Mrs. Marwaha's receipt of that notice. Mrs. Marwaha has satisfied all administrative prerequisites to file suit under the ADA.[2]

## FACTUAL ALLEGATIONS

15. In 2024, Courtney Peterson[3] (hereinafter "Ms. Peterson"), EEI's then-Chief Human Resources Officer, recruited Mrs. Marwaha to join EEI.

16. Ms. Peterson separately served as Mrs. Marwaha's executive coach and mentor through her coaching business, "Lotus Leadership Coaching, LLC," at the time of her recruitment to join EEI.

17. The open position was initially designated as a Human Resources Manager position. In recognition of Mrs. Marwaha's qualifications and experience, Ms. Peterson elevated the position to Senior Manager.

[1] Exhibit A, Plaintiff's Charge of Discrimination (Charge No. 570-2026-02491).
[2] Exhibit B, Notice of Right to Sue.
[3] To Plaintiff's knowledge, Courtney Peterson legally changed her name to Courtney Chisholm in 2025. However, during all relevant periods, her last name was Peterson.

18. In the offer letter dated May 27, 2024, EEI offered Mrs. Marwaha the Senior Manager position with a starting salary of $140,000 and eligibility for a performance-based bonus equal to ten percent of her base salary.

19. Mrs. Marwaha brought more than fifteen (15) years of experience in organizational leadership, compliance, and human capital management. She completed a multi-round interview process involving eleven (11) EEI members.

20. On July 8, 2024, Mrs. Marwaha joined EEI as Senior Manager, Human Resources. Within her first week, Mrs. Marwaha created an electronic file record-keeping standard operating procedure for EEI's core Human Resources (hereinafter "HR") active records.

**Mrs. Marwaha's Rapid Career Advancement and Strong Performance**

21. In August 2024, EEI increased Mrs. Marwaha's base salary from approximately $140,000 to approximately $160,000 to reflect her expanded managerial responsibilities.

22. In September 2024, Ms. Peterson gave Mrs. Marwaha a written performance review of "Exceeds Expectations." Ms. Peterson departed EEI soon after on September 30, 2024, after initiating structural changes that left the HR department significantly understaffed.

23. On October 1, 2024, less than ninety (90) days into her tenure, EEI promoted Mrs. Marwaha to Senior Director, HR, with a salary of approximately $200,000, reflecting EEI's recognition of Plaintiff's strong performance and the expanded scope of leadership responsibilities assigned to her. This promotion was approved by then-CEO Dan Brouillette, following an executive interview process.

24. Mrs. Marwaha inherited a department reduced from approximately ten employees to three, and assumed responsibility for compensation, budgeting, policy, open enrollment, recruiting, compliance, and workforce planning.

25. Between October 2024 and March 2025, Mrs. Marwaha hired and onboarded more than twenty (20) full-time employees. Because of the severe understaffing, Mrs. Marwaha routinely worked well beyond forty (40) hours per week and effectively functioned as EEI's head of HR, despite holding only a Senior Director title.

26. In or around January or February 2025, then-interim Chief Executive Officer and Board Chair, Pat Vincent-Collawn (hereinafter "Ms. Vincent-Collawn"), advised Mrs. Marwaha by email that she had earned the highest performance rating of a 4, which equates to an "Exceeds Expectations." As a result, Mrs. Marwaha received a merit increase that raised her salary from approximately $200,000 to approximately $207,000, and a prorated performance bonus. During this period, Ms. Vincent-Collawn also served as Mrs. Marwaha's dotted-line boss.

27. In June 2025, Mrs. Marwaha led a company-wide reduction in force that achieved a 100% return of severance agreements and zero financial liability to EEI. Ms. Vincent-Collawn expressed how impressed she was by Mrs. Marwaha's work in successfully leading the company-wide reduction in force. Notably, Ms. Vincent-Collawn shared with Mrs. Marwaha how much she valued the confidence and sensitivity with which Mrs. Marwaha managed and executed the company-wide reduction in force.

28. In July 2025, following her mid-year performance review, Mrs. Marwaha requested a salary adjustment because her salary was below the mid-point of the Senior Director salary band. In support of her salary adjustment request, Mrs. Marwaha highlighted the cost savings that she achieved within the HR department. Ms. Vincent-Collawn then approved Mrs. Marwaha's request in writing, increasing her salary from approximately $207,000 to

approximately $218,400. The July 2025 equity increase brought Mrs. Marwaha to the mid-point of the Senior Director salary band.

29. On the last day of her tenure with EEI, Ms. Vincent-Collawn told Mrs. Marwaha how highly she regarded her HR expertise and their partnership. Ms. Vincent-Collawn then personally hand delivered a bottle of wine to Mrs. Marwaha as a token of appreciation.

**Mrs. Marwaha's Disability and Early Disclosures**

30. Mrs. Marwaha was diagnosed with LBBB in January 2023, in addition to hypertension and stress-aggravated cardiac symptoms, for which she takes multiple medications daily and requires annual cardiac monitoring each December followed by a follow-up appointment with a cardiologist who specializes in electrophysiology.

31. Her condition substantially limits major life activities including the operation of her cardiovascular and circulatory functions and her ability to work in high-stress conditions without triggering symptoms such as heart palpitations and elevated blood pressure.

32. Mrs. Marwaha disclosed her cardiac condition to Ms. Peterson in 2024, and again to Ms. Vincent-Collawn in November 2024, when she informed her of her upcoming December 2024 appointment to receive a cardiac monitor. Mrs. Marwaha did not experience any adverse treatment following these disclosures.

**Ms. Greaves' Assumption of Chief Administrative Officer Position**

33. On July 7, 2025, Ms. Greaves joined EEI as Chief Administrative Officer and became Mrs. Marwaha's supervisor. After Ms. Greaves assumed supervisory authority, Mrs. Marwaha's experience at EEI materially deteriorated.

34. In July 2025, while Mrs. Marwaha was working remotely with COVID-19 and her colleague was on approved leave, Ms. Greaves told Mrs. Marwaha that the quality of her work

went down. This was said despite Mrs. Marwaha's illness and the understaffed department. Ms. Greaves also said this while having only been at EEI for less than one month.

35. Ms. Greaves subjected Mrs. Marwaha to heightened scrutiny. She repeatedly criticized Mrs. Marwaha for purported "defensiveness" and "lack of documentation," despite Mrs. Marwaha's achievements and the increased workload caused by staffing reductions within the HR department and across the company. The June 2025 reduction in force had eliminated more than twenty (20) positions just two weeks before Ms. Greaves assumed the position as Chief Administrative Officer. Mrs. Marwaha was still managing the ongoing effects of the reduction, including benefits and staff morale.

36. From July 2025 to October 2025, Ms. Greaves repeatedly told Mrs. Marwaha and others that she was "moving fast and coming down hard on HR." This was notwithstanding Ms. Greaves' acknowledgement of understaffing.

37. Despite Ms. Greaves' early and continued criticisms, she did not complete any formal written performance review for Mrs. Marwaha. Mrs. Marwaha additionally lacked an approved, finalized job description and defined goals against which Ms. Greaves later claimed her performance was deficient.

38. Ms. Greaves also faulted Mrs. Marwaha's professional judgment while continuing to rely on her. She labeled Mrs. Marwaha's explanation of negotiated anti-harassment training costs as "pushback"; rejected a qualified outside compliance consultant Mrs. Marwaha had identified and instead reassigned that work to the already-understaffed HR team; and assigned Mrs. Marwaha supervision of an additional employee that other leadership had declined to oversee, all while Mrs. Marwaha remained responsible for EEI's core HR functions. This

escalation of responsibilities and criticism was paired with Ms. Greaves' continued reliance on Mrs. Marwaha's competence.

**Mrs. Marwaha's Disability Disclosures and Accommodation Requests with Ms. Greaves**

39. In or around late September or early October 2025, Mrs. Marwaha disclosed her cardiac condition to Ms. Greaves and informed her that she would need to wear a cardiac monitor in December 2025 and may need to work remotely during that period. Ms. Greaves indicated that the remote work arrangement was acceptable.

40. On September 26, 2025, Mrs. Marwaha received written confirmation from her cardiology provider of an upcoming cardiac-monitoring appointment on December 1, 2025, and follow-up appointments on February 10, 2026, and March 9, 2026. Mrs. Marwaha promptly informed Ms. Greaves of the upcoming appointments via email in early October 2025.

41. On or about October 1, 2025, Mrs. Marwaha gave Ms. Greaves a written physician's note that documented her full medical profile, confirmed that she sees two specialists for her health conditions, and stated that stress adversely impacts her cardiac condition.

42. That same day, Mrs. Marwaha attended a meeting with Ms. Greaves and explicitly requested a reasonable accommodation: the hiring of an additional HR Lead who would serve in a supervisory role between herself and Ms. Greaves, to reduce the workplace stress that was directly and adversely impacting her cardiac condition.

43. Mrs. Marwaha reiterated that the HR department had been reduced from approximately ten employees to three, and that she sought to restore adequate staffing to her

understaffed department. This restructuring request was directly related to the limitations caused by her disability.

44. On or about October 5, 2025, Ms. Greaves confirmed, via email, that she "plan[ned] to move forward with hiring a supervisor for the HR team as [Mrs. Marwaha] raised."

45. Despite that commitment, more than two weeks passed without action. Ms. Greaves did not draft a job description as she proposed, did not take steps to hire an HR Lead, and did not discuss any alternatives to Mrs. Marwaha's request. When Mrs. Marwaha followed up and asked Ms. Greaves for an update on the job description draft, Ms. Greaves told her that she had not yet had a chance to do it and stated that she was okay with Mrs. Marwaha drafting the job description for Ms. Greaves' review.

46. Mrs. Marwaha subsequently drafted the job description to prevent the process from being prolonged any further.

47. Upon completing the job description, Mrs. Marwaha provided it to Ms. Greaves for review and Ms. Greaves withheld feedback for another week. The HR Lead position – the exact position Mrs. Marwaha requested to accommodate her medical condition – was not posted until October 29, 2025, nearly a month after the request, notwithstanding Ms. Greaves' written commitment to provide it.

48. On or about October 7, 2025, Ms. Greaves asked, via email, whether Mrs. Marwaha wished to initiate a formal ADA accommodation process. Mrs. Marwaha stated that she would revisit the need for formal accommodations after her December 1, 2025, cardiac monitoring appointment and her February 2026 follow-up appointment.

**<u>Mrs. Marwaha's Worsening Symptoms and Defendants' Failure to Act</u>**

49. On or around October 30, 2025, Mrs. Marwaha reported to Ms. Greaves in writing that she was experiencing heart palpitations and elevated blood pressure at work, and that she had scheduled a cardiac follow-up appointment for November 7, 2025.

50. That evening, Ms. Greaves texted Mrs. Marwaha "[p]lease take care of yourself," but did not re-engage Mrs. Marwaha in any discussion regarding accommodations, did not request updated medical information, and did not explore whether additional support or adjustments were needed following her cardiac episode.

51. Despite this, Mrs. Marwaha worked through her symptoms that evening and the following day, completing and submitting the updated Employee Handbook and anti-discrimination policy on October 31, 2025, which were deliverables that were recommended by EEI's outside counsel.

52. During the week of November 3, 2025, Mrs. Marwaha printed ADA-related paperwork in preparation for her November 7, 2025, cardiac follow-up appointment.

53. On or about November 3, 2025, Mrs. Marwaha sent Ms. Greaves an intake form to initiate EEI's hiring process for the HR Lead role. Mrs. Marwaha then met with Ms. Greaves the following day to thoroughly discuss the hiring process. Ms. Greaves stated that she intended to keep the role open through November 7, 2025, the same date as Mrs. Marwaha's scheduled cardiac appointment, so that Mrs. Marwaha could begin sourcing candidates and provide an initial applicant list by that date.

**Mrs. Marwaha's Termination**

54. On the morning of November 6, 2025 – one day before Mrs. Marwaha's scheduled cardiac follow-up appointment – Ms. Greaves and Deputy General Counsel and Corporate Compliance Officer, Vicki Calderon (hereinafter "Ms. Calderon"), terminated Mrs. Marwaha's

employment, effective immediately. Ms. Greaves first stated that Mrs. Marwaha's position was being eliminated because EEI was hiring an HR Lead – the very role Mrs. Marwaha had requested as a reasonable accommodation. When Mrs. Marwaha questioned the elimination of her role in favor of a position that remained unfilled, Ms. Greaves shifted to characterizing Mrs. Marwaha's performance as the reason, asserting that she had failed to document a recently promoted employee's prior concerns.

55. Deputy General Counsel and Corporate Compliance Officer, Ms. Calderon, had previously instructed Mrs. Marwaha to never combine performance concerns and position elimination in a single termination conversation – precisely what Ms. Greaves did.

56. Mrs. Marwaha had never been placed on a performance improvement plan or formally disciplined. The separation agreement provided by EEI also did not provide a reason for termination.

57. Following the termination, Ms. Greaves and Ms. Calderon remained in Mrs. Marwaha's office and watched her pack her belongings, questioned her about a bag containing her personal items, and publicly escorted her through the office to the elevator in view of other staff. At approximately noon, EEI circulated an internal announcement that Mrs. Marwaha was "no longer with EEI effective today," before providing her any written separation documents. By contrast, other employees separated in EEI's reductions in force were permitted to pack privately and depart at the end of the day.

58. As Ms. Greaves and Ms. Calderon escorted Mrs. Marwaha to the elevator, Ms. Greaves told Mrs. Marwaha, in sum and substance, that EEI would be happy to provide her with a reference letter. Offering a reference letter was a part of the separation process that Mrs. Marwaha developed and established for employees whose positions were eliminated in EEI's

June 2025 and September 2025 reductions in force. That process did not apply and was not offered to employees terminated for performance. Ms. Greaves was familiar with these processes. Nonetheless, Mrs. Marwaha declined the offer.

59. Mrs. Marwaha was terminated one day before her scheduled cardiac follow-up appointment, within approximately one week of reporting a documented cardiac episode, approximately three weeks before her annual cardiac monitor for which Ms. Greaves had agreed to a remote-work accommodation, and within days of submitting significant anti-discrimination compliance deliverables all within approximately forty-five days of her disability disclosure and accommodation requests to Ms. Greaves.

**Pretext, Comparators, and Departure from Customary Practice**

60. Defendants offered shifting and contradictory explanations for Mrs. Marwaha's termination, alternating between "restructuring" or "position elimination" and "poor performance," but the separation agreement did not provide a reason for the termination. Further, the HR Lead position that EEI cited as the basis for eliminating Mrs. Marwaha's role remained vacant more than two months after her termination, undermining any contention that her role was eliminated for a legitimate restructuring. These facts support the inference that Defendants' stated reasons are pretextual.

61. The termination also came within days of Mrs. Marwaha's completion of major compliance deliverables. At the recommendation of EEI's outside counsel, Mrs. Marwaha drafted and, on October 31, 2025, submitted an updated anti-discrimination, harassment, and retaliation policy as well as a revised employee handbook; arranged anti-discrimination supervisory training; branded EEI's ethics hotline; and documented and escalated internal workplace harassment and discrimination concerns to senior leadership. Mrs. Marwaha

successfully completed this work all while still recovering from her documented cardiac episode from the day before. The close timing between these deliverables and her termination undermines Defendants' asserted performance and restructuring rationales.

62. Consistent with her leadership role and her responsibility to implement EEI's outside counsel recommended compliance improvements, Mrs. Marwaha requested to take a Society for Human Resource Management (hereinafter "SHRM") training course, but Ms. Greaves did not respond to her request. Notably, Mrs. Marwaha's request to take the SHRM training course was not prompted by any performance warning, discipline, or identified deficiency.

63. Moreover, on or around October 26, 2025, Ms. Greaves praised Mrs. Marwaha's strategic roadmap, stating, "this really looks good, and I know this is a lot of work." Days later, at the November 6, 2025 termination meeting, Ms. Greaves faulted Mrs. Marwaha for failing to complete a file-management project that had been introduced only one week earlier. The file-management project was initially intended for an outside consultant, but because the consultant was too expensive, Ms. Greaves reassigned the project to Mrs. Marwaha and her team. When the project was assigned, Mrs. Marwaha told Ms. Greaves that it could not feasibly be completed during the fourth quarter (Q4), the busiest period of the year for HR, because of budgeting, open enrollment, and performance reviews. Ms. Greaves nonetheless cited the incomplete project as grounds for a "poor performance" criticism.

64. Although Ms. Greaves orally criticized Mrs. Marwaha and her team, to Mrs. Marwaha's knowledge, Ms. Greaves never initiated EEI's progressive discipline process. Ms. Greaves never provided Mrs. Marwaha with any written documentation of performance

deficiencies to respond to or contest, and Mrs. Marwaha was never offered any corrective training.

65. EEI maintained a written progressive discipline policy. EEI's employee handbook contains a "Performance Management System" provision that cited performance check-ins with supervisors, the opportunity to reflect on progress towards goal attainment, and discuss insights on performance.[4] The handbook provides: "The periodic check-ins offer an opportunity for employees and supervisors to evaluate and rate core performance competencies and discuss any growth opportunities…After each discussion, your supervisor will submit your performance rating." If, for example, an employee received a "Needs Improvement" or "Unsatisfactory" rating, the handbook states that a discussion between the supervisor and the HR Department is required to discuss next steps, which may include a performance improvement plan.

66. Consistent with that written policy, EEI's established practice was to apply progressive discipline including counseling, mandated training, and performance improvement plans, before terminating employees for performance. For example, former Talent Lead, Monica Evans, and former HR Director, Carrie Smith, were placed on performance improvement plans in or around the beginning of 2024, as a documented form of progressive discipline. As another example, in or around late 2024 or early 2025, Mrs. Marwaha asked Ms. Calderon for EEI's performance improvement plan template for possible use with an employee, and Ms. Calderon provided it.

[4] *See* Exhibit C, EEI Handbook, pp. 21-22.

67. Mrs. Marwaha, within the capacity of her role, had also trained managers on progressive discipline, and Ms. Greaves attended those training sessions on numerous occasions.

68. EEI's established separation practices for employees affected by restructuring or reductions in force included paying affected employees through the end of the applicable pay period, affording advance notice or transition runway, and providing private, dignified separations. For example, employees separated in June 2025 were paid through the end of the applicable pay period, and EEI's international team, notified on September 30, 2025, that their roles would end on December 31, 2025, were given approximately three months' runway and full pay through year-end. Mrs. Marwaha was not afforded these practices.

69. Despite EEI's written performance management provisions in its handbook and its established practices, Defendants applied no progressive discipline measures to Mrs. Marwaha – no counseling, no documented performance discussion, and no performance improvement plan – before abruptly terminating her for alleged poor performance. Defendants' departure from their written policy that they followed for other employees further supports that the performance rationale was pretextual.

70. As a direct and proximate result of Defendants' conduct, Mrs. Marwaha suffered substantial economic loss. Defendants paid her only through the November 6, 2025 termination date rather than through November 15, 2025 – the end of the pay period that was routinely applied to others; caused her to forfeit 67% vesting of her 401(k), which would have vested approximately eighteen (18) days later; deprived her of EEI's non-elective 3% retirement contribution, which required employment through December 31, 2025; deprived her of her 2025 performance bonus of approximately $21,840; and withheld her cell-phone stipend,

fitness reimbursement, and professional-development reimbursements, including the renewal of her professional certification.

71. Mrs. Marwaha's medical benefits also terminated on November 30, 2025. At the time of termination, Defendants knew that Mrs. Marwaha had a heart monitor appointment scheduled for December 1, 2025 – one day after her coverage would end. As a result, Mrs. Marwaha had to repeatedly push her doctor's office to move the appointment before November 30, 2025, so that it would still be covered.

72. Mrs. Marwaha also suffered emotional and physical distress, including elevated blood pressure documented by her cardiologist, the cancellation of her November 7, 2025 cardiology appointment, and the loss of an elected leadership position in a regional professional association, together with reputational harm within the Washington, D.C. human-resources community.

## CAUSES OF ACTION

### COUNT I
### Disability Discrimination in Violation of the ADA, 42 U.S.C. § 12112
(Against EEI)

73. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

74. The ADA, 42 U.S.C. § 12112(a), prohibits a covered entity from discriminating against a qualified individual on the basis of a disability in regard to the discharge of employees and other terms, conditions, and privileges of employment.

75. At all relevant times, Defendant was a covered entity within the meaning of the ADA.

76. At all relevant times, Mrs. Marwaha was an individual with a disability within the meaning of 42 U.S.C. § 12102, and a qualified individual who could perform the essential functions of her position with or without reasonable accommodation.

77. EEI had notice of Mrs. Marwaha's disability, which she disclosed to EEI leadership, including Ms. Greaves, and documented with a written physician's note and provider correspondence.

78. Defendant discriminated against Mrs. Marwaha because of her disability by subjecting her to heightened scrutiny and pretextual criticism, and by terminating her employment on November 6, 2025. The shifting and contradictory reasons offered for her termination, specifically the "elimination" of her position for the position she requested that remained vacant, the absence of any progressive discipline, the close proximity of the termination to her disability disclosure and cardiac episode, and Defendant's departure from its written policies and established practices demonstrate that her disability was a determining factor in her termination.

79. Defendant acted with malice or reckless indifference to Mrs. Marwaha's federally protected rights.

80. As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Mrs. Marwaha has suffered, and will continue to suffer, loss of wages, employment benefits, emotional distress, mental anguish, humiliation, and other compensable damages in an amount to be proved at trial.

81. As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs as provided by applicable law.

**COUNT II**
**Failure to Accommodate in Violation of the ADA, 42 U.S.C. § 12112(b)(5)**

(Against EEI)

82. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

83. The ADA, 42 U.S.C. § 12112(b)(5), provides that discrimination against a qualified individual on the basis of disability includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

84. At all relevant times, Defendant was a covered entity within the meaning of the ADA.

85. At all relevant times, Mrs. Marwaha was an individual with a disability within the meaning of 42 U.S.C. § 12102, and a qualified individual who could perform the essential functions of her position with or without reasonable accommodation.

86. Mrs. Marwaha asked Defendant to restore adequate staffing to its understaffed HR department by hiring an additional HR Lead, and she expressly tied that request to her cardiac condition and the stress that aggravated it.

87. Mrs. Marwaha's request sought a reasonable accommodation in the form of job restructuring within the meaning of 42 U.S.C. § 12111.

88. Defendant had notice of Mrs. Marwaha's disability and her need for accommodation, including through her oral disclosures and her written physician's note.

89. Defendant failed to provide the requested accommodation and failed to re-engage in a good-faith interactive process. Defendant stalled Mrs. Marwaha's accommodation request for nearly a month, left the requested HR Lead position vacant, and after Mrs. Marwaha

reported a cardiac episode on October 30, 2025, failed to re-engage her regarding accommodations before terminating her.

90. Defendant failed to demonstrate that the requested accommodation would impose an undue hardship on the operation of the business.

91. Defendant acted with malice or reckless indifference to Mrs. Marwaha's federally protected rights.

92. As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Mrs. Marwaha has suffered, and will continue to suffer, loss of wages, employment benefits, emotional distress, mental anguish, humiliation, and other compensable damages in an amount to be proved at trial.

93. As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs as provided by applicable law.

## COUNT III
**Retaliation in Violation of the ADA, 42 U.S.C. § 12203**
(Against EEI)

94. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

95. The ADA, 42 U.S.C. § 12203(a), prohibits discrimination against any individual because that individual has opposed any act or practice made unlawful by the ADA.

96. At all relevant times, Defendant was a covered entity within the meaning of the ADA.

97. At all relevant times, Mrs. Marwaha was an individual with a disability within the meaning of 42 U.S.C. § 12102, and a qualified individual who could perform the essential functions of her position with or without reasonable accommodation.

98. Mrs. Marwaha engaged in protected activity when she requested a reasonable accommodation for her disability. A request for a reasonable accommodation is protected activity under the ADA.

99. Following her protected activity, Defendant subjected Mrs. Marwaha to a materially adverse action by terminating her employment on November 6, 2025 – one day before her scheduled cardiac appointment.

100. A causal connection exists between Mrs. Marwaha's protected activity and her termination, as shown by the close temporal proximity between her accommodation request and her termination, the fact that Defendant terminated her for the stated reason that it was hiring the exact HR Lead she had requested as an accommodation, the continued criticisms that followed her request, the absence of any prior discipline, and Defendant's shifting explanations for the termination.

101. Defendant acted with malice or reckless indifference to Mrs. Marwaha's federally protected rights.

102. As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Mrs. Marwaha has suffered, and will continue to suffer, loss of wages, employment benefits, emotional distress, mental anguish, humiliation, and other compensable damages in an amount to be proved at trial.

103. As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs as provided by applicable law.

## COUNT IV
**Disability Discrimination in Violation of the D.C. Human Rights Act, D.C. Code § 2-1402.11**

(Against EEI and Ms. Greaves)

104. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

105. The DCHRA, D.C. Code § 2-1402.11, makes it an unlawful discriminatory practice for an employer to discharge or otherwise discriminate against an individual with respect to the terms, conditions, or privileges of employment, wholly or partially for a discriminatory reason based on disability, including by failing to provide reasonable accommodation.

106. At all relevant times, Mrs. Marwaha was an individual with a disability within the meaning of D.C. Code § 2-1401.02, who was qualified for her position with or without reasonable accommodation.

107. Defendants discriminated against Mrs. Marwaha because of her disability by delaying and ultimately failing to provide the reasonable accommodation she requested, despite having committed in writing to provide it; by failing to re-engage in the interactive process after she reported worsening symptoms; and by terminating her employment on November 6, 2025, one day before her scheduled cardiac appointment, wholly or partially for a reason based on her disability.

108. A causal connection exists between Mrs. Marwaha's disability and her termination, as shown by the fact that Defendants terminated her for the stated reason that it was hiring the HR Lead she had requested as an accommodation, the continued criticisms that followed her accommodation request, the absence of any prior discipline, Defendants' shifting explanations for the termination, and the role that remained vacant following her termination.

109. Defendants acted with malice or reckless indifference to Mrs. Marwaha's statutorily protected rights.

110. As a direct, proximate, and foreseeable result of Defendants' unlawful conduct, Mrs. Marwaha has suffered, and will continue to suffer, loss of wages, employment benefits, emotional distress, mental anguish, humiliation, and other compensable damages in an amount to be proved at trial.

111. As a result of Defendants' conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs as provided by applicable law.

**COUNT V**
**Retaliation in Violation of the D.C. Human Rights Act,**
**D.C. Code § 2-1402.61**
(Against EEI and Ms. Greaves)

112. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

113. The DCHRA, D.C. Code § 2-1402.61, makes it an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, any right granted or protected under the DCHRA.

114. At all relevant times, Mrs. Marwaha was an individual with a disability within the meaning of D.C. Code § 2-1401.02, who was qualified for her position with or without reasonable accommodation.

115. Mrs. Marwaha engaged in activity protected by the DCHRA when she requested a reasonable accommodation for her disability.

116. Defendants retaliated against Mrs. Marwaha for that protected activity by subjecting her to escalating criticism, delaying and ultimately failing to provide the reasonable accommodation she requested, and abruptly terminating her employment. One of Defendants' shifting reasons for the termination was that they were hiring an HR Lead,

the very position Mrs. Marwaha requested as an accommodation to reduce the stress aggravating her cardiac condition and to address the HR department's understaffing.

117. A causal connection exists between Mrs. Marwaha's protected activity and her termination, as shown by the close temporal proximity between her accommodation request and her termination, the fact that Defendant terminated her for the stated reason that it was hiring the exact HR Lead she had requested as an accommodation, the continued criticisms that followed her request, the absence of any prior discipline, and Defendant's shifting explanations for the termination.

118. Defendants acted with malice or reckless indifference to Mrs. Marwaha's statutorily protected rights.

119. As a direct, proximate, and foreseeable result of Defendants' unlawful conduct, Mrs. Marwaha has suffered, and will continue to suffer, loss of wages, employment benefits, emotional distress, mental anguish, humiliation, and other compensable damages in an amount to be proved at trial.

120. As a result of Defendants' conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs as provided by applicable law.

## COUNT VI
**Aiding and Abetting Unlawful Discrimination and Retaliation in Violation of D.C. Human Rights Act, D.C. Code § 2-1402.62**
(Against Ms. Greaves)

121. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

122. Under the DCHRA, D.C. Code § 2-1402.62, it shall be an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter or to attempt to do so.

123. Ms. Greaves, acting in her capacity as EEI's Chief Administrative Officer and Mrs. Marwaha's direct supervisor, personally directed and carried out the unlawful conduct set forth herein.

124. In or around late September or early October 2025, Mrs. Marwaha disclosed her cardiac condition to Ms. Greaves and requested a reasonable accommodation, the hiring of an HR Lead, which she tied directly to her medical condition. On or about October 5, 2025, Ms. Greaves agreed, in writing, to provide the accommodation but never implemented it. Instead, she stalled Mrs. Marwaha's accommodation request for nearly a month, left the requested HR Lead position vacant, and after Mrs. Marwaha reported a cardiac episode on October 30, 2025, failed to re-engage her regarding accommodations.

125. On November 6, 2025, Ms. Greaves terminated Mrs. Marwaha, telling her that her position was being eliminated because EEI was hiring an HR Lead – the exact accommodation that Mrs. Marwaha requested and tied directly to her medical condition. When Mrs. Marwaha questioned this explanation, Ms. Greaves then shifted to citing Mrs. Marwaha's performance as the reason for termination.

126. As Ms. Greaves and Ms. Calderon escorted Mrs. Marwaha to the elevator, Ms. Greaves told Mrs. Marwaha, in sum and substance, that EEI would be happy to provide her with a reference letter. Offering a reference letter was a part of the separation process that Mrs. Marwaha established for employees whose positions were eliminated in EEI's 2025 reductions in force. That process was not offered to employees terminated for performance. Ms. Greaves was familiar with these processes.

127. Despite the written performance management provisions in EEI's handbook and EEI's established practices, Ms. Greaves did not provide any progressive disciplinary

measures to Mrs. Marwaha – no counseling, no documented performance discussion, no performance check-in, no documented negative performance ratings, and no performance improvement plan – before terminating her for alleged poor performance one day before her scheduled cardiac follow-up appointment.

128. Through the conduct described herein, Ms. Greaves directly associated herself with EEI's unlawful discriminatory practices and aided and abetted the commission of acts prohibited under the DCHRA, in violation of D.C. Code § 2-1402.62.

129. As a direct and proximate result of Ms. Greaves' conduct, Mrs. Marwaha has suffered, and will continue to suffer, loss of wages, employment benefits, emotional distress, mental anguish, humiliation, and other compensable damages in an amount to be proved at trial.

130. As a result of Ms. Greaves' conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs as provided by applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Mrs. Marwaha respectfully requests that this Court enter a judgment:

a. Declaring that Defendants' conduct violated the ADA and the DCHRA;

b. Awarding Mrs. Marwaha back pay, front pay, and lost benefits, including lost retirement contributions and vesting, plus interest;

c. Awarding Mrs. Marwaha compensatory damages for economic loss, emotional distress, and reputational harm;

d. Awarding Mrs. Marwaha punitive damages to the extent permitted by applicable law;

e. Awarding Mrs. Marwaha reasonable attorneys' fees and costs; and

f. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Mrs. Marwaha demands a trial by jury in this action on the claims so triable.

Dated: October 14, 2026

Respectfully submitted,

/s/ *Kiara I. McGill*
Kiara I. McGill, Esq.
D.C. Bar No.: 90012694
The Mundaca Law Firm, LLC
1300 I Street Northwest, Suite 400E
Washington, D.C. 20005
Main: (202) 474-8500
Direct: (240) 258-3893
Email: kmcgill@mundacalaw.com

*Counsel for Jyoti Marwaha*